UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                    :
NANCY MOREA,                                        :
                                                    :        15 Civ. 2720 (PAE)
                              Plaintiff,            :
                                                    :        OPINION & ORDER
              -v-                                   :
                                                    :
ERIC K. FANNING, Secretary of the Army,             :
(U.S. Army Corps of Engineers),                     :
                                                    :
                              Defendant.            :
                                                    :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This case involves claims under the Rehabilitation Act ("the Act"), 29 U.S.C. § 701 *et seq.*, by a civilian federal employee of the United States Army, Nancy Morea. Morea asserts that, after she suffered a minor heart attack that required the insertion of several stents, she had a disability that her employer, the U.S. Army Corps of Engineers (the "Army"), did not reasonably accommodate. Morea brings claims of discrimination and retaliation. With discovery complete, the Army has moved for partial summary judgment, limited to Morea's claim of discrimination, and to the argument that Morea's post-stent condition did not rise to the level of a disability within the meaning of the Act. For the reasons that follow, the Court grants the Army's motion.

## I.    Background

Morea's discrimination claim is based on the fact that, following her mid-June 2014 heart attack, the Army denied her August 2014 request to expand, from twice-weekly to four-times-a-week, her "teleworking" schedule, intended to facilitate her visits to a cardiac rehabilitation facility near her home. Morea claims that this denial was unreasonable. In moving for summary judgment on that claim, the Army argues solely that the evidence before the Court does not

support Morea's assertion that she had a disability "substantially limiting" a major life activity or bodily function, as required for the Act to apply to her. The Army does not pursue summary judgment on other grounds (*e.g.*, the reasonableness of its denial of her request for additional teleworking days). The pertinent facts are as follows.

### A.     Factual Background[1]

### 1.     Morea's Heart Attack

In 2008, Morea began working for the Army as a "realty specialist," tasked with managing the armed forces' career centers in New Jersey. JSUF ¶ 2. Morea has lived in Hackettstown, New Jersey, at all relevant times, and she commuted to work at the Federal Building at 26 Federal Plaza in downtown Manhattan. JSUF ¶ 3. Within six months of starting work for the Army, Morea was granted two days of telework per week as part of the Federal DOD Alternative Workplace Program, and thereby worked from her New Jersey home on Mondays and Fridays. Compl. ¶ 14. She was promoted each year, ultimately holding a "FS 12-5" pay grade. *Id.* ¶ 12. As of June 2014, Morea had not received any negative evaluations or disciplinary actions. *Id.* ¶ 15.

On June 17, 2014, Morea suffered a heart attack. She was admitted to Morristown Memorial Hospital in New Jersey. JSUF ¶ 7. Dr. Barry Lowell, the affiliated cardiologist who treated Morea, determined that the cause of Morea's heart attack was that her coronary arteries had become so blocked that only minimal blood could flow through them. Hu Decl., Exh. 4

---

[1] The facts are substantially undisputed and are largely set out in the parties' Joint Stipulation of Undisputed Facts, Dkt. 28 ("JSUF"). The Court also cites herein (1) the Army's Local Rule 56.1 Statements of Facts, Dkt. 33 ("Defendant 56.1"), (2) Morea's response, Dkt. 38 ("Morea 56.1 Response"), and (3) the declaration of Jessica Jean Hu, Dkt. 34 ("Hu Decl."), which attaches four exhibits, each consisting of deposition testimony. Solely for background facts that are not dispositive to this motion, the Court cites to Morea's Complaint ("Compl."), Dkt. 1.

(Deposition of Barry Lowell) ("Lowell Dep.") at 20–21, 24. Dr. Lowell performed a percutaneous coronary intervention (PCI)[2] on Morea's right coronary artery and on her left anterior descending artery. JSUF ¶ 8. Three stents were placed in Morea's heart during this procedure, following which blood flow was restored through the treated vessels. *Id.* ¶¶ 8–10. Morea was released from the hospital the following day. *Id.* ¶ 11.

### 2.    Morea's Post-Heart Attack Convalescence and Travel Restrictions

On June 20, 2014, three days after the PCI procedure, Dr. Lowell sent a note to the Army, stating in pertinent part that:

> Nancy Morea recently had coronary stenting—as she recovers it's advised she be restricted to not travel long distances for 2 weeks. She may work remotely. She will be on meds and it's recommended she attend cardiac rehab which is 3x/wk for 12 weeks—following this she will have no restrictions. Perhaps she may be permitted a 3rd day to work remotely so she can complete the rehab program.

Hu Decl., Exh. 4 at 41. Dr. Lowell testified that he recommended that Morea "not travel long distances for two weeks" as a result of the incision and bruising in Morea's leg, because "the movement and motion of the leg may sometimes be painful." Lowell Dep. at 31–32. Dr. Lowell testified that there was no restriction on Morea's ability to ride as a passenger in a vehicle during those two weeks, as opposed to doing the driving herself, and that Morea could work remotely during her two-week period of convalescence. *Id.* at 32–34.[3]

---

[2] A PCI is a procedure that opens these blocked arteries. A physician inserts stents through a distant blood vessel, in Morea's case, in her leg. The stent is then maneuvered through the blood vessel and into the affected coronary artery. Lowell Dep. at 20–21.

[3] The distinction that Dr. Lowell drew between Morea's driving and being driven during the two weeks appears to arise from Morea's commuting practices. While the record on this motion is imprecise as to how many days per week Morea personally drove from her home to the Army's Manhattan office (as opposed to receiving a ride from another), her counsel, at argument, stated that Morea sometimes carpooled with others.

Morea's supervisor, Cartavius Whitehead, granted Morea's request to telework on an *ad hoc* basis during the two weeks following her PCI. This period lasted until July 3, 2014. Morea 56.1 ¶ 7.

### 3. Morea's Normal Stress Test

After her PCI, Morea continued to see Dr. Lowell approximately once every three months. Lowell Dep. at 15.

On July 11, 2014, Morea underwent a stress test at Dr. Lowell's office. The purpose of that test was to measure Morea's heart's functioning in the wake of the heart attack and PCI procedure. *Id.* at 57–58. Morea's ejection fraction, which Dr. Lowell explained "demonstrates the efficiency of her heart's function," was determined to be normal. *Id.* at 58. Although Dr. Lowell testified that there was "notable dysfunction of the back wall of her heart," he also explained that Morea did not have any "substantial injury" to her heart, and that Morea's heart attack had been "minor." *Id.* at 58–59.

Dr. Lowell's notes from the stress test report reflect that Morea had demonstrated "normal hemodynamic response to exercise," Hu Decl., Exh. 4 at 31; Dr. Lowell explained that at the time of the stress test, Morea "was able to remain on the treadmill and demonstrate a good functional status . . . [with] no evidence of coronary insufficiency," Lowell Dep. at 52. Asked whether Morea was "substantially impaired" with regard to her ability to engage in exercise or any other physical activities, Dr. Lowell testified that she was not. With regard to Morea's heart condition, Dr. Lowell testified that "[t]here's no impairment." *Id.* at 53.[4]

---

[4] Although not germane to the Army's summary judgment motion based on lack of evidence of qualifying disability, the physician whom the Army used to evaluate Morea's condition reached the same conclusion. On the basis of his review of Morea's medical records and his examination of Morea on July 13, 2016, Dr. Stanley J. Schneller, a professor of cardiology at Columbia University, attested that Morea was neither impaired nor disabled as a result of her cardiac condition. *See* Declaration of Stanley J. Schneller ("Schneller Decl."), Dkt. 35. Dr. Schneller

### 4. Morea's Cardiac Rehabilitation at Saint Clare's

On July 28, 2014, Dr. Lowell referred Morea to Saint Clare's Hospital in Denville, New Jersey, for cardiac rehabilitation ("rehab") services, JSUF ¶ 1,—the same services to which Dr. Lowell had referred in his June 20, 2014 note to the Army. Hu Decl., Exh. 4 at 41. Dr. Lowell testified that the purpose of such a rehab program is to "provide[] for a monitoring period" to ensure that the patient is "not in danger of having lethal heart rhythm disturbances." Lowell Dep. at 94. The program consists of "a teaching phase that instructs patients to improve their lifestyle"; it also offers "physiologic benefits" insofar as doing exercise and maintaining fitness reduces a person's adrenaline levels, "thus likely diminishing the instance of arrhythmias." *Id.* Dr. Lowell did not attest that failure to complete the rehab program would heighten Morea's risk of a heart attack; Morea's functional improvement after the insertion of the stents had already been demonstrated. *Id.* at 92–93. Dr. Lowell testified that there were no physical restrictions on Morea during the rehab program. However, Dr. Lowell testified, he regarded it as medically necessary that Morea complete such a program. *Id.* at 36–38.

Dr. Lowell testified that he recommended St. Clare's Hospital because he is the director of that facility. *Id.* at 38–39. He testified, however, that there was no medical need for Morea to complete a rehab program in that particular facility; had Morea asked for a referral to a facility in New York City such as near her Army workplace, Dr. Lowell would have provided one. *Id.* The time of day at which Morea attended the rehab program was also not consequential. *Id.* at 41–42.

---

attested that Morea's condition "remained characterized by a full recovery" between her normal stress test on July 11, 2014 and his examination of her. *Id.* ¶ 12. He further attested that the presence of some arrhythmias would not require intervention or substantially limit Morea in any way. *Id.* ¶¶ 13–14. Overall, Dr. Schneller's assessment is similar to that of Dr. Lowell.

On July 23, 2014, Dr. Lowell gave Morea a note intended for her employer, stating that her rehabilitation schedule at St. Clare's called for her to be there three days a week from 8 am–11 am, which included the two-hour rehab program plus travel time between the facility and Morea's Hackettstown, N.J., home, beginning on July 31 and ending on or about October 21, 2014. Hu Decl., Exh. 2 at 29; *see also*, Lowell Dep. at 42, 69, 91. Dr. Lowell testified that, when he had (in his June 20 note to the Army) suggested the possibility of a third day of telework, it was in order to facilitate Morea's attendance at the program at St. Clare's (Morea had mentioned a "work commitment" to him, and his support for the additional telework was "a suggestion" that might help her "complete the program" at St. Clare's). Lowell Dep. at 38.

### 5. Morea's August 8, 2014 Examination and Ensuing Condition

In the weeks after her stress test, Morea experienced arrhythmias, or palpitations, leading Dr. Lowell, in a memo documenting an August 8, 2014 examination, to describe "palpitations, supraventricular tachycardias, and atrial fibrillations." Lowell Dep. at 56. However, Dr. Lowell testified, these symptoms did not reflect any impairment to Morea's walking, seeing, hearing, thinking, driving, moving, or working. *Id*. at 56–57. On the contrary, he testified that there had been no such impairment reflected in either Morea's July 11, 2014 stress test or her August 8, 2014 exam. *Id*. Palpitations, Dr. Lowell testified, are common, and may be triggered by drinking a cup of coffee; arrhythmias and fibrillation (a type of arrhythmia) are also common and may reflect stress. *Id*. at 98–100. Further, while persons with *excessive* atrial fibrillation are prone to stroke, some atrial fibrillation also occurs in healthy hearts. *Id*. at 100. Dr. Lowell encouraged Morea to participate in "[a]ll the activities of daily living"; he did not advise her to refrain from any activities. *Id*. at 76.

During the August 8, 2014 examination, Morea reported various sources of stress in her life, such as the fact that that "she was alone," had "problems with her significant other, children,

[and] ex-husband," was trying to balance work and cardiac rehabilitation, and "hadn't been sleeping well." *Id.* at 64. Dr. Lowell testified that these did not, however, give rise to concerns about Morea's cardiovascular health at that time. *Id.*

At Morea's request, Dr. Lowell that day filled out a Medical Information Sheet for the Equal Employment Opportunity Office. It stated: "Nancy would like to work from home on rehab days, quite reasonable!" Hu Decl., Exh. 4 at 43. On the same note, Dr. Lowell wrote that Morea's prognosis was "[e]xcellent," adding, "No impairment to job—needs to finish rehab." *Id.* Dr. Lowell testified that, while he did not regard Morea as impaired or restricted in any activity, he supported her desire to work from home because he "wanted to see to it that that [rehab] course was completed." Lowell Dep. at 67. And while it was not required that Morea continue her rehab at Saint Clare's, it was logically sensible for Morea to do so because she had begun her sessions there, and teleworking on rehab days "would facilitate her ability to get to rehab." *Id.* at 68–69. Dr. Lowell understood from Morea that she "had a long drive and would likely have wanted to shower and go home after the rehab, and then to endure a long drive would only have detracted from her ability to likely complete the program." *Id.*

On August 27, 2014, Morea saw Dr. Lowell again, reporting stress and chest discomfort. Dr. Lowell's assessment of her heart, however, was unchanged. He found no cause for further testing, attributing her discomfort merely to stress. *Id.* at 69–71.

In quarterly visits to Dr. Lowell in October 2014 and February 2015, Morea again complained of stress. Notwithstanding these stressors, as of February 27, 2015, Dr. Lowell's assessment remained that Morea was "doing well and may continue full unrestricted activities." *Id.* at 78; Hu Decl., Exh. 4 at 32. Dr. Lowell did not believe that Morea's driving to work was detrimental to her heart, but, he testified, "the stress . . . [Morea had] been under for whatever the

nature of her work might have been . . . detrimental to her cardiac status." Lowell Dep. at 84. In

general, Dr. Lowell stated, stress reduction, along with other "[h]ealthy lifestyle changes," would

benefit Morea's heart. *Id.* at 101–02.

### 6.    Morea's Requests for Accommodation and the Army's Response

For the two weeks after her June 17, 2014 heart attack, Morea requested *ad hoc* telework,

and the Army, per supervisor Whitehead, granted that request. JSUF ¶ 12.

On August 4, 2014, Morea submitted a "Request for Reasonable Accommodation" form

to the Army, based on her heart condition.[5] Hu Decl., Exh. 4 at 42. Morea wrote that she was

required to attend cardiac rehabilitation as part of her post-heart-attack medical treatment; that as

a result of the treatment she was "unable to drive into [her] N.Y. office"; and that she sought

"some adjustments in [her] work enviroment [sic]," in particular, four days of telework per week

during the rehabilitation treatment period. *Id.* In her deposition, Morea testified that she sought

to expand her teleworking arrangement from two days to four each week, because she lived far

from Manhattan; and because, on days she went to rehab, between attending rehab, showering,

and driving to the office, she would have first arrived at work at 1pm or 2 pm. Hu Decl., Exh. 2

at 11.

On August 13, 2014, Whitehead, received Morea's request. Hu Decl., Exh. 2 at 35. He

denied the request. *Id.* at 34. Memorializing this decision on a "Reasonable Accommodation

Request Checklist" form, Whitehead checked "No" both as to (1) whether the disability and need

for accommodation were obvious, and (2) whether the employee "ha[d] a physical or mental

disability that substantially limit[ed] one or more major life activities." *Id.* Whitehead wrote

---

[5] The record is unclear as to Morea's schedule and activities between Monday, July 7 (the first
work day after Morea's two-week approved telework) and August 4 (when she submitted a
request for accommodation).

that the accommodations Morea sought were neither available nor reasonable, and that Morea "appears to be ineligible for reasonable accommodation." *Id.* He added that he was "unable to approve Ms. Morea's requested accommodation . . . [because] the medical documentation submitted by Ms. Morea indicates that she has '[n]o impairment to job.'" *Id.* at 21. As support, Whitehead cited Dr. Lowell's August 8, 2014 note reporting that Morea's prognosis was "excellent" and that Morea was "restricted only in that she needs to complete [the] course." *Id.*

On August 24, Morea was given a memorandum notifying her of her right to file a formal complaint of discrimination based on denial of her request for accommodation. JSUF ¶ 18.

### 7. Morea's Claim of Discrimination to the Army EEO

On July 28, 2014, Morea first contacted the Army's Equal Employment Opportunity Office ("EEO"), alleging that her supervisors, Whitehead and Noreen "Dean" Dresser, were discriminating against her. JSUF ¶ 16. At that point, she had not begun the rehab program, *see id.* ¶ 15, nor had she yet made her request for four days per week of telework, *see* Hu Decl., Exh. 4 at 42. On September 2, 2014, after her August 4, 2014 request was denied, Morea filed a formal complaint of discrimination with the EEO. JSUF ¶ 19.

Morea's EEO complaint identified multiple bases of alleged discrimination, including Race ("Caucasian"), Color ("White"), and Physical ("Heart attack" and "Ulcerative colitis"). Hu Decl., Exh. 2 at 19.[6] She wrote that "while I was out sick (with doctors [sic] excuse) my agency refused to pay me." *Id.* She added that "[t]he agency discriminated against me on 10 July 14

---

[6] In this lawsuit, Morea limits her basis for claiming discrimination to her heart condition, but before the EEOC in January 2015, she testified that she believes her request for accommodation had been denied "based on medical and color and race," Hu Decl., Exh. 1 at 7, and in her July 2016 deposition testimony, she testified that it was "[p]ossibl[e]" Whitehead had discriminated against her on the basis of sexual orientation. Hu Decl., Exh. 2 at 13. Morea is a white, heterosexual woman. JSUF ¶ 1.

with regard to my medical records/disability."[7] She further wrote that her request for accommodation had been denied, and alleged, as a grievance, "reprisal—eliminated my telework" and "harassment—aggressive pressure/intimidation." *Id.* at 20.

### B. Procedural History of this Case

On April 8, 2015, Morea filed the Complaint, alleging that the Army had violated the Rehabilitation Act by failing to reasonably accommodate a disability and by retaliating against her after she complained of such discrimination. On July 6, 2015, the Army answered, denying the claims of discrimination and retaliation. Dkt. 4 ("Ans.").

On December 5, 2016, after discovery, the Army moved for partial summary judgment, limited to Morea's discrimination claim. Dkts. 32, 36. On December 21, 2016, Morea filed a memorandum of law in opposition. Dkt. 37. On January 11, 2017, the Army filed a reply memorandum. Dkt. 39 ("Def. Reply Br."). On June 27, 2017, the Court heard argument.

## II. Summary Judgment Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d

---

[7] The parties have not identified any event occurring on or about July 10, 2014.

Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**III.    Discussion**

**A.    Discrimination Claims Under the Rehabilitation Act**

**1.    In general**

Morea brings her claim of discrimination under the Rehabilitation Act of 1973 (the "Act"), Section 501 of which "'provides the exclusive route by which federal employees may raise claims of employment discrimination on the basis of disability.'" *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 296 (S.D.N.Y. 2014) (internal citations omitted). The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, protects against discrimination and retaliation by private sector employers as well as state and local government employers, but it does not apply to the federal government. *See* 42 U.S.C. § 12111.

The Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794. It requires federal departments and agencies to implement an

"affirmative action plan" for the hiring and advancement of persons with disabilities, and provides that the standards used under the ADA guide the determination whether an employer has violated the Act. 29 U.S.C. § 791(f). Relevant here, ADA § 12112 prohibits discrimination "against a qualified individual on the basis of disability." It defines such discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Claims of discrimination under the Act, as under the ADA, are applied using the familiar burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Heilwell v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994). Under it, the plaintiff bears the initial burden of demonstrating a *prima facie* case of discrimination; the burden then shifts to the employer to provide a legitimate nondiscriminatory reason for the adverse action; and if the employer is able to do so, the burden shifts back to the plaintiff to show that the employer's stated reason is actually a pretext for discrimination. *See, e.g.*, *Nadel*, 57 F. Supp. 3d at 295 (claim under Rehabilitation Act); *Sussle v. Sirina Protection Systems Corp.*, 269 F. Supp. 2d 285, 295 (S.D.N.Y. 2003) (claim under ADA). To establish a *prima facie* a case under the Act, a plaintiff must demonstrate that: "(1) she was a qualified individual with a disability; (2) she was discriminated against by the public entity; and (3) such discrimination was due to the plaintiff's disability." *B.C. v. Mount Vernon School District*, 837 F.3d 152, 158 (2d Cir. 2016) (citing *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)).

## 2. The Requirement of a "Disability"

The Army's summary judgment motion implicates solely the first prong of the *prima facie* case standard. It argues that, even viewing the evidence in the light most favorable to Morea, it is insufficient to establish that she had a "disability" within the meaning of the Act.

The ADA defines a "disability" as "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The statute defines "major life activities" to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," *id.* § 12102(2)(A), as well as major bodily functions including "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions," *id.* § 12102(2)(B).

To determine whether a plaintiff's alleged impairment satisfies the disability prong of a *prima facie* case, the Second Circuit has applied the three-step approach adopted in *Bragdon v. Abbott*, 524 U.S. 624 (1998). *See Weixel v. Board of Educ. of City of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002). First, the plaintiff must "show that she suffers from a physical or mental impairment." *Id.* "Second, the plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity.'" *Id.* "Third, the plaintiff must show that her impairment 'substantially limits' the major life activity previously identified." *Id.*

Significantly, in 2008, Congress passed the ADA Amendments Act ("ADAAA"). It included, among disabilities, "[a]n impairment that is episodic or in remission." 42 U.S.C. § 12102(4)(D). The impairment must still be one that "would substantially limit a major life activity when active." *Id.* The ADAAA was enacted to "reject the reasoning of court decisions

13

concluding that certain individuals with certain conditions—such as epilepsy or post-traumatic stress disorder—were not protected by the ADA because their conditions were episodic or intermittent." 29 C.F.R. § 1630. The ADAAA further provides that the limitations imposed by disabilities are to be considered without the effects of mitigating measures, other than corrective eyewear. 42 U.S.C. § 12102(E)(i)–(iii). The ADAAA expressly applies to the Rehabilitation Act, *Kravtsov v. Town of Greenburgh*, No. 10 Civ. 3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012), and thus its standards apply here.

**B.    Discussion**

The sole issue presented by the Army Corps.' summary judgment motion with regard to Morea's discrimination claim is whether the evidence would permit a reasonable jury to find that—during the period beginning August 2014, when her request for accommodation in the form of added teleworking days was denied—she had a "disability" within the meaning of the Rehabilitation Act. If so, the motion must be denied. If not, the motion must be granted—as the statute does not supply any charter for a court or jury to consider the reasonableness of an employer's response to Morea's accommodation request absent a qualifying disability.

The Court considers, first, whether the evidence could have sustained a finding of a disability based on the standard that applied before the ADAAA broadened the meaning of a disability to include episodic impairments and to require that mitigating measures, other than corrective eyewear, not be considered.

Under that standard, a plaintiff must not only establish that she "suffers from a physical or mental impairment," but must also "identify the activity claimed to be impaired and establish that it constitutes a 'major life activity'" and "show that her impairment 'substantially limits' the major life activity previously identified." *Weixel*, 287 F.3d at 147. In *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), the Supreme Court held that for an impairment

14

to substantially limit a major life activity, it must "prevent[] or severely restrict[] the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 185. The disability alleged there stemmed from carpal tunnel syndrome. The Supreme Court held that the plaintiff's inability to perform certain tasks—involving gripping tools and repetitive work with her hands and arms extended at or above shoulder levels for extended periods of time—did not constitute a disability because she was not substantially limited in activities central to daily life, such as personal hygiene or household chores, but was limited only in tasks associated with a particular assembly-line job. *Id.* at 186.

Here, Morea bases her claim of a qualifying disability on the testimony of one medical professional, Dr. Lowell, who was her treating physician. But that testimony forecloses any potential finding that Morea's post-stent condition qualified an impairment substantially limiting a major life activity. As reflected above, in his deposition testimony, Dr. Lowell repeatedly described Morea—after the insertion of the stents—as *not* impaired. Indeed, the only activity he was prepared to caution Morea against at any point after the PCI procedure was driving a car during the two weeks immediately after the procedure. That was because movement and motion of the leg (where the insertion of the stents had been) "may sometimes be painful." Lowell Dep. at 31–32. The restriction on driving, however, lapsed two weeks after the PCI procedure, *i.e.*, on or around July 1, 2014, more than a month before Morea first made the request for accommodation on which she bases her Rehabilitation Act claimed.

Dr. Lowell did not identify any other limitation on Morea's activities. On the contrary, per his instructions, Morea was free immediately to ride in a car as a passenger and to perform her job for the Army Corps., remotely during her first two weeks of convalescence and at her work station in Manhattan thereafter. *Id.* at 32–34. Dr. Lowell, in fact, affirmatively encouraged

Morea to participate in "[a]ll the activities of daily living," did not advise Morea to refrain from any activities, and the next February, when she complained of stress, assessed that Morea was in fact "doing well and may continue full unrestricted activities." *Id.* at 56–57, 76, 78. Dr. Lowell's testimony to this effect is fully consistent with the notes of his examinations of her. There is no contrary medical evidence.[8]

Courts in this circuit have consistently required a plaintiff claiming a disability to present medical evidence in support of such a claim, *see, e.g.*, *Sussle*, 269 F. Supp. 2d at 301.[9] Here, not only is there no medical evidence supporting her claim of a disability within the meaning of the Act: The medical evidence that has been adduced, from Morea's own treating physician, contradicts any such claim.

Unsurprisingly in light of this record, Morea primarily bases her argument that her heart attack left her with a disability on the 2008 ADAAA amendments, passed in response to the Supreme Court's decision in *Toyota* to broaden the statute to cover conditions that are "episodic" or "in remission," *id.* § 12102(4)(D), but that, "when active," inherently limit major life and bodily functions, Morea Br. at 8–9. Morea argues that her heart attack qualifies as such an

---

[8] Dr. Lowell's encouragement of Morea to attend rehab sessions did not, as he testified, bespeak a disability. Nor did his recommendation that the Army accommodate Morea's travel to the rehab facility in New Jersey. As Dr. Lowell, explained, he recommended that facility because he was affiliated there and to accommodate Morea's preferences and convenience. *Id.* at 37–39, 68–69, 95–96.

[9] "District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, 'without supporting medical testimony, simply is not sufficient to establish [a] prima facie case under the ADA.'" *Sussle*, 269 F. Supp. 2d at 301 (quoting *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 392 (S.D.N.Y. 1998) (collecting cases)). A plaintiff's self-serving, conclusory claims as to limitations on major life activities or bodily functions, "without more, are not proof of a substantial limitation on a person's major life activities." *Nadel*, 57 F. Supp. 3d at 296 (citing *Farina v. Branford Bd. of Educ*, 458 F. App'x. 13, 15 (2d Cir. 2011)).

"episodic event," in that, there "is no question that while active"—on June 17, 2014—Morea's "heart attack limited [her] cardiovascular system." *Id.* at 9. A heart attack in the future, she notes, would similarly limit that system while active. As support that she may be prone to a further heart attack, she notes Dr. Lowell's testimony that the heart attack damaged a part of her heart muscle and that she has experienced arrhythmias since the heart attack, and arrhythmias, Dr. Lowell testified, can "reduce . . . the efficiency of the heart." Lowell Dep. at 98.

On the factual record at hand, these arguments do not establish an episodic condition. As to the damage to the back wall of Morea's heart, Dr. Lowell's testimony was that, following the insertion of the stents and the restoration of blood flow in her coronary arteries, Morea is not limited in her activities. He did not opine that, as a result of the damage to the back wall of her heart, Morea is compromised—let alone apt to experience episodic heart attacks. On the contrary, Dr. Lowell testified that Morea had not experienced a "substantial injury," that Morea's heart attack had been "minor", that the limitation on coronary blood flow had been effectively treated by the insertion of the stents, that her stress test revealed a normal ejection fraction and a normal ability to tolerate exercise, and that Mora's medical evaluations post-heart attack had not yielded any "evidence of coronary insufficiency." Lowell. Dep. at 52, 58–59. As to Morea's arrhythmias, Dr. Lowell testified that while some degree of atrial fibrillation is common and may accompany stress or drinking a cup of coffee, Morea "did [not] have an excessive amount" of arrhythmia. *Id.* Morea does not point to any part of Dr. Lowell's testimony or medical records that would permit a factfinder to view her post-stent status as akin to episodic condition like epilepsy or an uncured condition in remission like cancer.

Morea also relies on the ADAAA provision that "mitigating measures"—save corrective eyewear—are not to be considered in determining the limitations imposed by disabilities. Morea

Br. at 10 (citing 42 U.S.C. §§ 12102(E)(i)–(iii)). Morea argues that her heart condition should be considered as if stents had not been surgically inserted, such that, in effect, her coronary arteries would remain blocked today. The "mitigating measures" to which the ADAAA refers, however, do not encompass surgical measures.[10] And the case law applying the ADAAA uniformly has considered plaintiffs' disability status with the benefits of surgical measures. *See, e.g.*, *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 126 (E.D.N.Y. 2015) (plaintiff had metal rods and screws surgically inserted into his back); *Nadel*, 57 F. Supp. 3d at 291 (plaintiff had surgery to repair ruptured knee patellar tendon); *Miller v. McHugh*, 814 F. Supp. 2d 299, 304 (S.D.N.Y. 2011) (plaintiff had surgery to repair torn meniscus).

In holding that Morea's post-PCI condition is not a disability because the evidence does not support that it substantially limits a major life activity or bodily function, the Court is guided by the Second Circuit's assessment of the ADAAA. The ADAAA, the Circuit has emphasized, was enacted in response to *Toyota* so as to bring within the statute disabilities that are episodic or intermittent, as opposed to ever-present. But, the Circuit has held, the ADAAA "le[ft] untouched the general definition of 'disability'" from the existing ADA, *see B.C.*, 837 F.3d at 160 (2d Cir. 2016), to wit, that the condition substantially limit a major life activity or bodily function. It is that requirement that, based on the record evidence, Morea's condition fails to meet.

The Second Circuit's decision in *Farina*, 458 F. App'x. at 13, both reinforces that such a showing remains required after the ADAAA, and supplies a useful analog to this case—albeit

---

[10] The ADAAA states that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as" medication, various medical devices, implantable hearing devices, assistive technology, reasonable accommodations or auxiliary services, learned behavioral changes or adaptive neurological modifications. 42 U.S.C. §§ 12102(E)(i)–(iii).

involving a different medical condition. In *Farina*, the Circuit affirmed a grant of summary judgment in favor of a school district, holding that the plaintiff, a school teacher, had failed to adduce evidence of a disability within the meaning of the statute. The Circuit reiterated that "[a] person is disabled within the meaning of the statute if that person has 'a physical or mental impairment that substantially limits one or more major life activities,' a 'record of such impairment,' or is 'regarded as having such an impairment.'" 458 F. App'x at 15 (citing 42 U.S.C. § 12102(1)). Such major life activities include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, [and] breathing[.]" *Id.* (citing 29 C.F.R. § 1630.2(i)(1)(i)).[11] The impairment, the Second Circuit stated, must be "permanent or long-term" to be "substantially limit[ing]." *Id.* (citing *Toyota,* 534 U.S. at 196, while noting that *Toyota* had, in part, been superseded by the ADAAA). Farina had claimed that a back injury and extreme fatigue and insomnia linked to her thyroid cancer constituted a disability. The Second Circuit held that they did not, in that, while Farina might have been substantially limited in the activity of "lifting" during the times of her two back surgeries, there was no evidence that any restrictions remained as of the point of the alleged discrimination. The Circuit similarly held that the evidence did not raise a triable issue of fact whether Farina's ability to sleep had been substantially limited as a result of her thyroid cancer-related ailments. *Id.*

---

[11] Although *Farina* cites only those "major life activities" relevant to Farina's case, the Code of Federal Regulations defines such activities also to include "learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i)). *See also*, *Baerga v. Hosp. for Special Surgery*, No. 97 Civ. 0230 (DAB), 2003 WL 22251294, at *3 (S.D.N.Y. Sept. 30, 2003) ("major life activities" are those "of central importance to daily life").

*Farina* is a useful point of comparison here, insofar as it similarly holds, post-ADAAA and based on an examination of the record evidence as to a medical condition, that a jury could not find a substantial limitation on a major life activity. Similar too, much as Farina was held not to have established any limitations on her sleeping that were "any worse than is suffered by a large portion of the nation's adult population," *Farina*, 458 F. App'x. at 16 (internal quotations omitted), Morea has not alleged any continuing effects of her heart attack beyond those (non-severe atrial fibrillations) that are "common" and triggered by quotidian events like stress or drinking a cup of coffee. Lowell Dep. at 99–100.

While mindful that every case turns on its facts, the Court notes, finally, that its holding that the evidence does not support that Morea's post-PCI heart condition substantially limits a major life activity of hers accords with the decisions of other courts to consider impairment claims under the ADA or the Rehabilitation Act presenting similar fact patterns, *e.g.*, plaintiffs with effectively treated coronary ailments and/or who had recovered from minor heart attacks. *See, e.g.*, *Baerga*, 2003 WL 22251294, at *4, 6 (coronary heart disease); *see also Gill v. Ryder Integrated Logistics*, No. 10-11318 (DJC), 2012 WL 2577561, at *4 (D. Mass. July 3, 2012) (prior heart attack); *McCann v. New World Pasta Co.*, No. 10 Civ. 1694 (CDP), 2012 WL 1081067, at *5–6 (E.D. Mo. March 30, 2012) (prior heart attack); *Borek v. Sudler Prop. Mgmt.*, No 11 Civ. 1154 (WJH), 2011 WL 6934827, at * 3 (N.D. Ill. Dec. 27, 2011) (prior heart attack).

The three cases on which Morea relies, in contrast, are factually afield. *Morrissette v. Cote Corporation*, 190 F. Supp. 3d 193 (D. Me. 2016), denied summary judgment, finding genuine issues of fact as to the lingering side effects of the plaintiff's artery disease and stroke. *Id.* The plaintiff there, however, adduced, in addition to evidence of a risk of a new stroke, evidence of lingering weakness in his left arm following the stroke, supporting a claim of a

"substantial limitation" on a major life activity. *Id.* at 199. Morea has not presented evidence that she is similarly compromised in such a fashion. Another case Morea cites, *Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC*, 58 F. Supp. 3d 446 (M.D. Pa. 2014), involved a plaintiff who had colon cancer that was in remission, requiring annual check-ups. *Id.* at 452. The court there denied summary judgment for the defendant, based on the ADAAA's inclusion in coverage of an "impairment that is episodic or in remission . . . if it would substantially limit a major life activity when active." *Id.* at 461 (quoting 42 U.S.C. § 12102(4)(D)). Morea, in contrast, cannot be said to have an impairment "in remission." Finally, *Suggs v. Cent. Oil of Baton Rouge, LLC*, No. Civ. A. 13-25 (RLB), 2014 WL 3037213, at *1 (M.D. La. July 3, 2014), involved a plaintiff who had been on sick leave for carotid artery disease treatment and was fired immediately upon returning to work. *Id. Suggs* is distinguishable insofar as it dealt with a convalescent (or immediately post-convalescent) patient. Morea, in contrast, had been examined by Dr. Lowell multiple times following her two weeks of limited convalescence and had been found unimpaired.

### CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for partial summary judgment, limited to Morea's discrimination claim under the Rehabilitation Act. The Court respectfully directs the Clerk of Court to close the motion pending at docket number 32.

The case will now proceed to trial on Morea's surviving claim for retaliation. The Court directs the parties to submit a joint pretrial order, consistent with the Court's individual rules, within four weeks of this order, *i.e.*, by September 1, 2017. Any motions *in limine* are to be filed along with the joint pretrial order. Oppositions to such motions are due one week later, *i.e.*, by

September 8, 2017.  After receiving the joint pretrial order, the Court will schedule a pretrial conference and a trial date.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 4, 2017
       New York, New York